## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY and COMMONWEALTH LAND TITLE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>RESIDENTIAL TITLE SERVICES, INC., ROBERT P. REYNOLDS, KEVIN M. MURPHY, ANDREW J. FURMAN, BRIAN J. CARRARA, JR., and ANTHONY J. KROLAK,<br><br>Defendants. | No. 09 C 2207 |

### AMENDED COMPLAINT

Plaintiffs, Fidelity National Title Insurance Company ("Fidelity") and Commonwealth Land Title Insurance Company ("Commonwealth"), by their attorneys, Ronald A. Damashek and Eric J. Malnar of Stahl Cowen Crowley Addis, LLC, for their Complaint against Defendants, Residential Title Services, Inc. ("RTS"), Robert P. Reynolds, Kevin M. Murphy, Andrew J. Furman and Brian J. Carrara, Jr. (collectively, the "Individual Defendants"), and Anthony J. Krolak, state the following:

### THE PARTIES

1.  Plaintiff, Fidelity National Title Insurance Company, is a California corporation with its principal place of business located in the State of Florida.

2.  Plaintiff, Commonwealth Land Title Insurance Company, is a Nebraska corporation with its principal place of business located in the State of Florida.

3.  Defendant, RTS, is an Illinois corporation with its principal place of business located in Lombard, Illinois 60148.

4. Defendant, Robert P. Reynolds is a citizen of the State of Illinois who resides in the Northern District of Illinois.

5. Defendant, Kevin M. Murphy is a citizen of the State of Illinois who resides in the Northern District of Illinois.

6. Defendant, Andrew J. Furman is a citizen of the State of Illinois who resides in the Northern District of Illinois.

7. Defendant, Brian J. Carrara, Jr. is a citizen of the State of Illinois who resides in the Northern District of Illinois.

8. Defendant, Anthony J. Krolak is a citizen of the State of Illinois who resides in the Northern District of Illinois.

## JURISDICTION

9. Jurisdiction of this Court is based on diversity of citizenship. The matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

## VENUE

10. Venue is proper in this Court pursuant to 28 USC § 1391(a)(1) and (2) because all Defendants reside within this Judicial District and a substantial part of the events giving rise to the claim occurred here.

## COUNT I – BREACH OF COMMONWEALTH AGENCY AGREEMENT

11. Commonwealth incorporates and realleges paragraphs 1 through 10 of this Complaint as though fully set forth herein.

12. On March 16, 1998, Commonwealth entered into an agency agreement with RTS (the "Commonwealth Agreement"). A copy of the Commonwealth Agreement is attached hereto as Exhibit A.

13. Under the Commonwealth Agreement, RTS agreed to represent Commonwealth as its representative or agent to solicit applications for title insurance, collect fees and premiums and issue and countersign title insurance policies ("Title Assurances").

14. Commonwealth has performed all of its obligations under the Commonwealth Agreement.

### Fees and Premiums

15. As part of the Commonwealth Agreement, RTS was responsible for the collection of state title policy fees and Commonwealth's share of title insurance premiums related to title insurance policies issued by RTS on behalf of Commonwealth ("Fees and Premiums").

16. In paragraph 2(e) of the Commonwealth Agreement, RTS agreed to keep all Fees and Premiums in a federally insured financial institution, in an account separate from RTS' individual accounts and designated as an "escrow" or "settlement funds" account, and disburse such Fees and Premiums only for the purposes for which they were entrusted.

17. Under the Commonwealth Agreement, RTS agreed:

   a. the Fees and Premiums were to be held by RTS (as trustee) in trust for Commonwealth (paragraph 3);

   b. not to delay or defer the payment of any Fees and Premiums unless expressly authorized by Commonwealth (paragraph 3); and.

   c. all Fees and Premiums not paid within 60 days would be considered delinquent and accrue interest (paragraph 5).

18. RTS collected Fees and Premiums under the terms of the Commonwealth Agreement.

19. RTS failed to separately maintain and disburse the Fees and Premiums collected on behalf of Commonwealth in accordance with the Commonwealth Agreement, including, at a

3

minimum, $173,258.01 in Fees and Premiums collected by RTS (comprised of $138,635.37 in estimated policy premiums based on information provided to Commonwealth by RTS, $33,164.64 in estimated policy premiums based on 540 unreported policy jackets, and $1,458.00 in state policy fees) that were not remitted to Commonwealth within 60 days of collection and remain outstanding and due and owing from RTS to Commonwealth ("Outstanding Fees and Premiums").

### Termination of Commonwealth Agreement

20. Effective April 14, 2008, Commonwealth terminated the Commonwealth Agreement with RTS.

21. Upon termination of the Commonwealth Agreement, RTS was required to immediately account for and pay to Commonwealth all Outstanding Fees and Premiums, and all other outstanding indebtedness owed by RTS to Commonwealth.

22. RTS failed to account for or pay to Commonwealth all Outstanding Fees and Premiums and indebtedness upon termination of the Commonwealth Agreement.

23. RTS breached the Commonwealth Agreement by:

   a. Failing to segregate the Outstanding Fees and Premiums entrusted to RTS for the benefit of Commonwealth for the purpose of the Title Assurances issued under the Commonwealth Agreement.

   b. Failing to properly disburse the Outstanding Fees and Premiums to Commonwealth that are, were, or should have been, contained in escrow accounts held in trust by RTS.

    c.    Failing to account for, and pay to Commonwealth, all Outstanding Fees and Premiums and other outstanding indebtedness due to Commonwealth upon termination of the Commonwealth Agreement.

24. As a result of RTS' breach of the Commonwealth Agreement, RTS owes Commonwealth at least $173,258.01 in Outstanding Fees and Premiums, plus interest, costs and reasonable attorneys' fees, subject to a full accounting by RTS pursuant to paragraph 13 of the Commonwealth Agreement.

25. Commonwealth has made due demand to RTS, but RTS has failed to make payment on the Outstanding Fees and Premiums owed to Commonwealth in accordance with the Commonwealth Agreement.

**WHEREFORE**, Commonwealth prays for the entry of judgment in its favor and against Residential Title Services, Inc. in the amount of the Outstanding Fees and Premiums due under the Commonwealth Agreement as of the date of judgment, reasonable attorney's fees and costs, plus interest on the foregoing, and such other and further relief as the Court deems just.

### COUNT II – BREACH OF PERSONAL GUARANTEE AND INDEMNITY AGREEMENT

**(Robert P. Reynolds, Andrew J. Furman, Kevin M. Murphy and Brian J. Carrara, Jr.)**

26. Commonwealth incorporates and realleges paragraphs 1 through 19 as though fully set forth herein.

27. On or about March 20, 1998, for good and valuable consideration, the Individual Defendants executed and delivered to Commonwealth a Personal Guarantee and Indemnity Agreement ("Individual Defendants' Guaranty") related to the Commonwealth Agreement. A copy of the Individual Defendants' Guaranty is attached as Exhibit B.

28. In paragraph 1 of the Individual Defendants' Guaranty, the Individual Defendants agreed to indemnify Commonwealth against any claims, actions, liabilities, losses, damages, expenses and charges, including, but not limited to, attorneys' fees arising out of or related to all escrow accounts opened by RTS.

29. In paragraph 2 of the Individual Defendants' Guaranty, the Individual Defendants agreed that all of the obligations in the Individual Defendants' Guaranty were joint and several.

30. The Outstanding Fees and Premiums described above arise out of and are related to RTS' escrow accounts and its obligations thereunder.

31. The Individual Defendants failed to indemnify Commonwealth against the Outstanding Fees and Premiums related to the escrow accounts opened by RTS.

32. The Individual Defendants are in breach of the Individual Defendants' Guaranty by failing to indemnify Commonwealth for the Outstanding Fees and Premiums related to RTS' escrow accounts.

33. As a result of the Individual Defendants' breach of the Individual Defendants' Guaranty, Commonwealth has been damaged in at least the amount of $173,258.01 in Outstanding Fees and Premiums, plus interest, costs and reasonable attorneys' fees, subject to a full accounting by RTS.

34. Commonwealth has made due demand upon the Individual Defendants, but the Individual Defendants refuse to indemnify Commonwealth for the Outstanding Fees and Premiums.

35. Commonwealth has performed all of its obligations under the Individual Defendants' Guaranty.

**WHEREFORE**, Commonwealth prays for the entry of judgment in its favor and against Robert P. Reynolds, Andrew J. Furman, Kevin M. Murphy and Brian J. Carrara, Jr., jointly and

severally, in the amount of the Outstanding Fees and Premiums due under the Commonwealth Agreement as of the date of judgment, reasonable attorney's fees and costs, plus interest on the foregoing, and such other and further relief as the Court deems just.

## COUNT III – CONVERSION

### (Robert P. Reynolds, Andrew J. Furman, Kevin M. Murphy and Brian J. Carrara, Jr.)

36. Commonwealth incorporates and realleges paragraphs 1 through 19 as though fully set forth herein.

37. Each of the Individual Defendants is a 25% owner of RTS and is an agent, director and/or officer of RTS.

38. Pursuant to paragraph 3 of the Commonwealth Agreement, the Fees and Premiums collected by RTS on behalf of Commonwealth were to be held in trust for Commonwealth by RTS and were due upon demand.

39. Commonwealth has an absolute and unconditional right to the immediate possession of all Outstanding Fees and Premiums pursuant to the Commonwealth Agreement.

40. Commonwealth has made due demand on the Individual Defendants to pay and turnover possession of the Outstanding Fees and Premiums that were supposed to be held in trust by RTS on behalf of Commonwealth.

41. The Individual Defendants acting by and through RTS, wrongfully and without authorization assumed control, dominion and ownership of the Outstanding Fees and Premiums and have failed to remit them to Commonwealth.

42. As a result, Commonwealth has been damaged by at least the amount of the Outstanding Fees and Premiums, plus its reasonable attorney's fees and costs of collection.

**WHEREFORE**, Commonwealth prays for the entry of judgment in its favor and against Robert P. Reynolds, Andrew J. Furman, Kevin M. Murphy and Brian J. Carrara, Jr. in the amount of the Outstanding Fees and Premiums due under the Commonwealth Agreement as of the date of judgment, reasonable attorney's fees and costs, plus interest on the foregoing, and such other and further relief as the Court deems just.

## COUNT IV - ACCOUNTING
### (Commonwealth v. RTS)

43. Commonwealth incorporates and realleges paragraphs 1 through 25 as though fully set forth herein.

44. Upon termination of the Commonwealth Agreement, RTS was required to deliver to Commonwealth copies of all title insurance policies issued by RTS pursuant to the Commonwealth Agreement that were in the possession of RTS and to account for, and pay to, Commonwealth all Outstanding Fees and Premiums and any other indebtedness owed by RTS to Commonwealth.

45. Upon termination of the Commonwealth Agreement, RTS also was required to turn over to Commonwealth all Documentation, as defined in paragraph 2(g) of the Commonwealth Agreement, at the request of Commonwealth.

46. There are Outstanding Fees and Premiums due to Commonwealth from the transactions conducted by RTS pursuant to the Commonwealth Agreement, the exact amount of which is currently unknown to Commonwealth because RTS has failed to provide an accounting and to turn over the Documentation to Commonwealth as required by the Commonwealth Agreement.

47. The accounting and the Documentation requested by Commonwealth is necessary to determine all of the Outstanding Fees and Premiums owed by RTS to Commonwealth and to make sure that no further title insurance policies are issued by RTS in Commonwealth's name.

48. Without an accounting and turn over of the Documentation, Commonwealth has no method to determine the total amount of the Outstanding Fees and Premiums, escrow accounts and/or any other indebtedness owed to Commonwealth by RTS and to make sure that no further title insurance policies are issued by RTS in Commonwealth's name.

49. Commonwealth has made written demand upon RTS for an accounting and turnover of the Documentation related to the Commonwealth Agreement.

50. RTS has failed to comply with Commonwealth's request for an accounting and turnover of the Documentation related to the Commonwealth Agreement.

51. In addition, notwithstanding the termination of the Commonwealth Agreement, RTS continues to list Commonwealth as an insurer for which RTS is an agent on its website, thereby holding itself out as Commonwealth's agent in violation of the Commonwealth Agreement.

**WHEREFORE**, Commonwealth prays for the entry of judgment in its favor and against Residential Title Services, Inc. for:

    a. An accounting of the transactions related to the Commonwealth Agreement.

    b. Return of all Documentation.

    c. Removal of Commonwealth's name from the RTS website.

    d. Reasonable attorney's fees and costs, and such other and further relief as the Court deems just.

## COUNT V – BREACH OF FIDELITY AGENCY AGREEMENT

52. Fidelity incorporates and realleges paragraphs 1 through 10 as though fully set forth herein.

53. On January 6, 2004, RTS entered into an Agency Agreement with Fidelity (the "Fidelity Agreement"). A copy of the Fidelity Agreement is attached hereto as Exhibit C.

54. Under the Fidelity Agreement, RTS agreed to represent Fidelity to collect fees and premiums and to countersign and issue title insurance commitments, binders, guarantees, endorsements and title insurance policies ("Title Assurances").

55. Fidelity has performed all of its obligations under the Fidelity Agreement.

### Fees and Premiums

56. Pursuant to paragraph 2(A)(9) of the Fidelity Agreement, RTS agreed to keep safe and segregate, in an FDIC insured escrow/trust account, all monies entrusted to RTS by Fidelity or others in the course of RTS' business operations and the issuance of Fidelity's Title Assurances (the "Entrusted Funds").

57. The Entrusted Funds include state title policy fees and Fidelity's share of title insurance premiums related to title insurance policies issued by RTS on behalf of Fidelity ("Fees and Premiums").

58. Under paragraph 2(A)(9) of the Fidelity Agreement, RTS owed a fiduciary duty to Fidelity, as owner of the Fees and Premiums, and agreed to be solely liable for any and all losses arising by reason of RTS' improper, unauthorized, reckless or premature disbursement of any escrowed Fees and Premiums.

59. In addition, pursuant to paragraph 4(A) of the Fidelity Agreement, RTS agreed to hold the Fees and Premiums in trust for Fidelity until such time as they were remitted to Fidelity.

60. RTS collected Fees and Premiums on behalf of Fidelity pursuant to the terms of the Fidelity Agreement and was required to remit those Fees and Premiums to Fidelity pursuant to paragraph 4(A) of the Fidelity Agreement.

61. RTS did not pay at least $248,025.11 in Fees and Premiums to Fidelity (comprised of $26,401.31 in title policy premiums based on known issued policies, $210,747.80 in estimated

policy premiums based on information provided to Fidelity by RTS, and $10,876.00 in state policy fees), which remain outstanding and due and owing from RTS to Fidelity (the "Outstanding Fees and Premiums").

62. RTS failed to keep safe and segregate the Outstanding Fees and Premiums in violation of the Fidelity Agreement.

### Losses

63. Pursuant to paragraph 6(B)(2) of the Fidelity Agreement, RTS agreed to be liable to Fidelity for the issuance of Title Assurances that contain errors or omissions which could reasonably have been detected by RTS from the commitment, examiner's report, title search or abstract causing a loss, including, but not exclusive to attorneys' fees, as defined in Section 12 of the Fidelity Agreement ("Losses").

64. Fidelity has incurred Losses as a result of RTS' issuing title insurance policies that contain errors or omissions that could reasonably have been detected by RTS ("RTS' Negligence").

65. Fidelity has incurred Losses as a result of RTS' Negligence in at least the amount of $80,569.14.

66. Fidelity has demanded that RTS reimburse or indemnify Fidelity for the Losses.

67. RTS has refused to reimburse or indemnify Fidelity for the Losses.

68. As a result, Fidelity has been damaged in at least the amount of the Losses.

### Termination of Fidelity Agreement

69. Effective September 22, 2008, Fidelity terminated the Fidelity Agreement with RTS.

11

70. Upon termination of the Fidelity Agreement, RTS was required, under paragraph 8(D) of the Fidelity Agreement, to provide Fidelity with a complete accounting and immediate payment of any and all Outstanding Fees and Premiums owing from RTY to Fidelity.

71. RTS failed to submit to Fidelity a complete accounting and immediate payment of all Outstanding Fees and Premiums upon termination of the Fidelity Agreement or thereafter.

72. RTS breached the Fidelity Agreement by:

   a. Failing to segregate the Outstanding Fees and Premiums entrusted to RTS for the benefit of Fidelity for the purpose of the Title Assurances issued under the Fidelity Agreement.

   b. Failing to properly disburse the Outstanding Fees and Premiums to Fidelity that are, were, or should have been, contained in escrow accounts held in trust by RTS.

   c. Issuing title insurance policies that contain errors or omissions that could reasonably have been detected by RTS and have caused Losses to Fidelity.

   d. Failing to account for, and pay to Fidelity, all Outstanding Fees and Premiums and other outstanding indebtedness due to Fidelity, including the Losses upon termination of the Fidelity Agreement.

73. As a result of RTS' breach of the Fidelity Agreement, RTS owes Fidelity at least $328,594.25 in Outstanding Fees and Premiums and Losses, plus interest, costs and reasonable attorneys' fees, subject to a full accounting by RTS.

74. Fidelity has made due demand to RTS, but RTS has failed to make payment on the Outstanding Fees and Premiums and Losses to Fidelity in accordance with the Fidelity Agreement.

**WHEREFORE**, Fidelity prays for the entry of judgment in its favor and against Residential Title Services, Inc. in the amount of Outstanding Fees and Premiums and Losses due under the Fidelity Agreement as of the date of judgment, reasonable attorney's fees and costs, plus interest on the foregoing, and such other and further relief as the Court deems just.

## COUNT VI - CONVERSION

**(Robert P. Reynolds, Andrew J. Furman, Kevin M. Murphy and Brian J. Carrara, Jr.)**

75. Fidelity incorporates and realleges paragraphs 52 through 62 as though fully set forth herein.

76. Each of the Individual Defendants is a 25% owner of RTS and is an agent, director and/or officer of RTS.

77. Pursuant to paragraph 4(A) of the Fidelity Agreement, the Fees and Premiums collected by RTS on behalf of Fidelity were to be held in trust for Fidelity by RTS and were due upon demand.

78. Fidelity has an absolute and unconditional right to the immediate possession of all Outstanding Fees and Premiums pursuant to the Fidelity Agreement.

79. Fidelity has made due demand on the Individual Defendants to pay and turnover possession of the Outstanding Fees and Premiums that were supposed to be held in trust by RTS on behalf of Fidelity.

80. The Individual Defendants acting by and through RTS, wrongfully and without authorization assumed control, dominion and ownership of the Outstanding Fees and Premiums and have failed to remit them to Fidelity.

81. As a result, Fidelity has been damaged by at least the amount of the Outstanding Fees and Premiums, plus its reasonable attorney's fees and costs of collection.

**WHEREFORE**, Fidelity prays for the entry of judgment in its favor and against Robert P. Reynolds, Andrew J. Furman, Kevin M. Murphy and Brian J. Carrara, Jr. in the amount of the Outstanding Fees and Premiums due under the Fidelity Agreement as of the date of judgment, reasonable attorney's fees and costs, plus interest on the foregoing, and such other and further relief as the Court deems just.

## COUNT VII – ACCOUNTING

82. Fidelity incorporates and realleges paragraphs 52 through 74 as though fully set forth herein.

83. Upon termination of the Fidelity Agreement, RTS was required, under paragraph 8(D) of the Fidelity Agreement, to provide a complete accounting to Fidelity and return the Policy Register, all unused forms, blanks and supplies, and all manuals, bulletins and instructions furnished by Fidelity to RTS (the "Documentation").

84. There are Outstanding Fees and Premiums due to Fidelity from the transactions conducted by RTS pursuant to the Fidelity Agreement, the exact amount of which is currently unknown to Fidelity because RTS has failed to provide an accounting and to turn over the Documentation to Fidelity as required by the Fidelity Agreement.

85. The accounting and the Documentation requested by Fidelity is necessary to determine all of the Outstanding Fees and Premiums owed by RTS to Fidelity and to make sure that no further title insurance policies are issued by RTS in Fidelity's name.

86. Without an accounting and turn over of the Documentation, Fidelity has no method to determine the total amount of the Outstanding Fees and Premiums, escrow accounts and/or any other indebtedness owed to Fidelity by RTS and to make sure that no further title insurance policies are issued by RTS in Fidelity's name.

87. Fidelity has made written demand upon RTS for an accounting and turnover of the Documentation related to the Fidelity Agreement.

88. RTS has failed to comply with Fidelity's request for an accounting and turnover of the Documentation related to the Fidelity Agreement.

89. In addition, notwithstanding the termination of the Fidelity Agreement, RTS continues to list Fidelity as an insurer for which RTS is an agent on its website, thereby holding itself out as Fidelity's agent in violation of the Fidelity Agreement.

**WHEREFORE**, Fidelity prays for the entry of judgment in its favor and against Residential Title Services, Inc. for:

    c. An accounting of the transactions related to the Fidelity Agreement.

    b. Return to Fidelity the Policy Register, all unused forms, blanks and supplies, and all materials, bulletins and instructions furnished by Fidelity to RTS.

    c. Removal of Fidelity's name from the RTS website.

    d. Reasonable attorney's fees and costs and such other and further relief as the Court deems just.

## COUNT VIII – ADDITIONAL BREACH OF FIDELITY AGENCY AGREEMENT

90. Plaintiff incorporates paragraphs 52 - 55 of Count V of this Complaint as though fully set forth herein.

91. Under paragraph 2(A)(1) of the Fidelity Agreement, RTS had a duty to perform its agency work for Fidelity "in accordance with the provisions of state law, in conformity with usual and customary practices and procedures, prudent underwriting principles and in full compliance with manuals, instructions, and bulletins of Company from time to time given to Agent."

15

92. During at least 2006 – 2007, RTS maintained an office in St. Louis County, Missouri (the "St. Louis Office").

93. During that time, RTS acted as a title agent for Commonwealth Land Title Insurance Company ("Commonwealth") and Fidelity National Title Insurance Company ("Fidelity") in conjunction with real estate purchase transactions involving Century Mortgage and Finance, Inc. ("Century"), a mortgage broker operating in the area (the "Century Transactions").

94. Many of the Century Transactions involved a fraudulent scheme whereby Century's representatives located homes that were free of debt, recruited buyers for the homes, caused the homes to be conveyed to the buyers at inflated prices through forged deeds, and absconded with the sales proceeds.

95. RTS handled the closings of, and caused Fidelity's title insurance policies to be issued insuring, many of the Century Transactions.

96. In so doing, RTS enabled the fraud to be committed by, among other things, permitting the seller's transaction documents to be executed out of RTS' presence, failing to verify the seller's alleged signatures on the documents, and issuing multiple seller's proceeds checks at Century's direction (that ultimately were endorsed by Century's representatives for their personal benefit) without written instructions from the seller or supporting invoices, statements or billings.

97. The foregoing activities were inconsistent with normal and customary real estate title insurance and closing transaction practices, and constituted "red flags" that should have, and did, alert RTS to actual or potential improprieties in the Century Transactions.

98. Notwithstanding that RTS' management was aware of these practices and should have stopped doing business with Century based thereon, RTS continued to close and issue title insurance for Century Transactions with these flawed procedures.

99. In fact, after Commonwealth raised concerns to RTS' management about the Century Transactions, RTS' management instructed its staff to continue providing title insurance for Century Transactions, but to insure those transactions as an agent for Fidelity.

100. Without limitation, RTS managers officers, and/or owners, Anthony Krolak ("Krolak") and Robert P. Reynolds ("Reynolds"), knew of the foregoing irregularities, failed to disclose them to Fidelity, and told RTS' staff to continue doing business with Century and to provide title insurance for the Century Transactions as Fidelity's agent, all for the personal gain and benefit of RTS, Krolak, and Reynolds.

101. RTS, Krolak and Reynolds were, or should have been, aware that RTS' actions with respect to the Century Transactions were inconsistent with Fidelity's bulletins and procedures that required its agents, such as RTS, to follow procedures aimed at curbing losses from fraud accomplished through the use of false identifications.

102. As a result of RTS' improper practices with respect to the Century Transactions, which were engaged in with the knowledge, consent, and direction of Krolak and Reynolds, Fidelity sustained Losses (as defined in paragraph 12A of the Agreement) in excess of $250,000.00 on the title insurance policies issued by RTS as Fidelity's agent for the Century Transactions (the "Missouri Losses").

103. Under paragraph 6 of the Agreement, RTS agreed to be liable to Fidelity for Losses attributable to:

a. the negligent, willful, or reckless conduct of RTS, RTS' employees or an independent contractor relied upon by RTS;

b. RTS' failure to comply with the terms and conditions of the Agreement or with the manuals, underwriting bulletins and/or instructions given to RTS by Fidelity;

c. RTS' Non-Title Assurance operations;

d. RTS' commission of fraud, conspiracy, dishonesty, or misrepresentation its aiding and abetting therein; and

e. RTS' failure to comply with the terms and conditions of the Agreement.

104. The Missouri Losses were attributable to, among other things, the factors identified in the preceding paragraph of this Complaint.

Wherefore, Fidelity prays for the entry of judgment in its favor and against Residential Title Services, Inc. in the amount of the Missouri Losses due under the Fidelity Agreement as of the date of judgment, reasonable attorney's fees and costs, plus interest on the foregoing, and such other and further relief as the Court deems just.

## COUNT IX – BREACH OF FIDUCIARY DUTY TO FIDELITY

105. Plaintiff incorporates paragraphs 90 – 102 of Count VIII of this Complaint as though fully set forth herein.

106. As Fidelity's agent, RTS owed fiduciary duties to Fidelity to perform its duties with the highest degree of loyalty and utmost good faith, not putting its own interests ahead of those of Fidelity.

107. RTS breached its fiduciary duties to Fidelity by issuing Fidelity's title insurance policies on the Century Transactions with knowledge of the infirmities in those Transactions and in

knowing disregard of the practices and procedures through which the fraudulent Transactions could have been avoided.

108. In so doing, RTS put its own interests ahead of those of Fidelity, breaching the duties of loyalty and good faith.

109. Krolak and Reynolds instigated, authorized, and participated in RTS' breach of its fiduciary duties to Fidelity, putting their own interests and those of RTS ahead of Fidelity.

110. As a result of RTS' breach of its fiduciary duties to Fidelity, and the involvement therein of Krolak and Reynolds, Fidelity has been damaged in the amount of the Missouri Losses.

Wherefore, Fidelity prays for the entry of judgment in its favor and against Residential Title Services, Inc., Anthony Krolak, and Robert P. Reynolds and in the amount of the Missouri Losses as of the date of judgment, reasonable attorney's fees and costs, plus interest on the foregoing, and such other and further relief as the Court deems just.

                                        Commonwealth Land Title Insurance Company
                                        and Fidelity National Title Insurance Company

                                        BY: _s/Ronald A. Damashek_
                                               One of their Attorneys

Ronald A. Damashek
Eric J. Malnar
Stahl Cowen Crowley Addis, LLC
55 W. Monroe, Suite 1200
Chicago, IL 60603
312/641-0060

Service List:

Residential Title Services Inc.
c/o its registered agent
Robert P. Reynolds
1910 S. Highland, Suite 2020
Lombard, IL 60148

Robert P. Reynolds
1910 S. Highland, Suite 2020
Lombard, IL 60148

Brian J. Carrara, Jr.
11278 Laura Lane
Frankfort, IL 60423

Andrew J. Furman
13356 Millbank Drive
Plainfield, IL 60544

Kevin M. Murphy
2 Appletree Court
Lake in the Hills, IL 60156